Good morning, your honors. May it please the court, my name is Ina Lipkin and I'm representing the petitioner. This is an immigration case. The Board of Appeals had affirmed the decision of the IJ denying asylum and some of the reasons that the IJ denied asylum, that petitioner disagrees with, was the IJ made a negative demeanor finding which the petitioner claims was incorrectly reached and was an incorrect basis upon which to find adverse credibility. Also, the IJ had made a negative inference from Exhibits 6 and 7. Those were affidavits from the petitioner's mother and wife, and the IJ had incorrectly stated that these documents were created in the United States and the wording was identical. How could that be? The Afghans are in India. However, if the court looks at the record, starting with page 446, it is clear that both of those documents were actually created in India and they have a stamp that says valid outside of India. I think that the IJ was looking at the next page, which is an interpreter's certification of some stamps that are contained on the back side of the affidavit. So on this basis, I think that the IJ's opinion should be disregarded or struck. The verification says that the foregoing is a true and correct translation of the Attached Punjabi document, but there was no Attached Punjabi. Yes. The next page, Your Honor, if you see at the top right-hand corner, there's some writing and a bit of a stamp. The original document, you will be able to see if you saw the original document, that is the back side of that document. That certification relates to the back side of the document where there was some scribbling and a stamp. Moving on to some other things. A little thing on page 447. Yes. 447, Your Honor. Hold on. Is that the attached? Yes, Your Honor. But that's certainly not the same as the affidavit. You see, Your Honor, if you go to page 446 of – excuse me, 445, that's the affidavit of Channon, and it's on a 20-rupee note. I'm sure the court has much experience with seeing such affidavits with a rupee note. And you'll see that there's an attestation made by the notary in Nawan Shahar in India. That's in English – in the English language. The next page is a verification of Gurmeet Singh, which is an employee of our law firm, and he is verifying that he has transcribed the words Channon Core W slash O Pakhar Singh, and then he writes that something is illegible, and then he writes that it comes true. I see. So the fourth element is just this little – these two sentences, basically. Yes. And I think that there was a misunderstanding in the proceedings where the judge thought that this verification refers to the actual English document on page 445, and he made the same mistake with the next document, which is the wife's affidavit on page 448. And I understand that this is not the only reason for the denial of the case, but I did want to point that out to the court in the beginning. Really, I think the main reason here is the I.J. concluded that the respondent's demeanor was maybe somewhat wooden, in the sense that when he described an instance of persecution, he had the same facial expression as when describing dates or talking about his family. But in the case of Jabril, if I'm pronouncing that correctly, the court noted that an I.J. can't make that kind of negative inference regarding demeanor unless he describes in more detail what it was about the demeanor that he found discredited the Petitioner's testimony. He did describe it. So the question is whether we can discount it and say, well, that just doesn't sound right to us. He said why. He said, I hardly ever do this, but this guy was essentially reciting disturbing things in a rote way. And so he described it. The question is, can we say, well, that doesn't make any sense? Some people just do that. Well, first of all, we don't know whether the I.J. routinely does this or not. Well, he said he did. All right. Well, let's take it at face value. But are we going to penalize someone who's testifying because they don't get very animated, because they don't have a lot of experience? The question isn't whether he described it. He did describe it. The question is whether we can judge his reason and say it's an inadequate reason. I believe it is inadequate because when looking at a whole, at all his other reasons for denying the case, he falls just a little bit short of really making a cogent credibility finding. For example, he speculates that because the petitioner failed to receive medical treatment and instead treated himself at home using milk and other herbal remedies, well, that is unacceptable. Because in America, if anybody even has a small scratch, he doesn't say this. This is my words. Well, we're going to run to the doctor with our HMO. We've read enough of these cases now, and you have as well, to know that for the most part, when anything is serious, the people in India do say that they went to a doctor. Sometimes it's not necessarily proven, but they say it. It seemed pretty serious, so it did seem somewhat unusual. It did, but there's nothing in the testimony that indicated that a bone was broken or anything that sort of needed emergency care. And because we're talking about a person from a rural Punjab community, he's a farmer, there's nothing in the record to state or to suggest that such a person would not seek home remedies. And I think that that alone is an insufficient basis to make an adverse credibility finding. Also, the IJ speculated that an individual such as the petitioner, that it would be implausible that he would know the arrest dates of the incidents that occurred to him, but not necessarily his own birth date or marriage date. Well, I think that that, again, is relying on speculation and conjecture. He was there to approve his asylum claim. His life was at stake. His future in the United States was at stake. So I think that it's very reasonable and plausible for him to know those dates at the forefront of his mind, because he knows he's going to be talking about them. Again, he's not necessarily a very literate person being a farmer, and there's no reason for him to automatically remember something like a marriage date. I don't know how many commercials we've seen in America where someone forgets an anniversary date, and there's some joke going on with that. I think here that is just an inappropriate basis to find him inconsistent, when he was consistent all throughout his testimony on direct and cross. Also, the judge made a determination that the documents regarding his passport and his son's passport, those were implausible. Now, I will concede that the photograph is not very clearly, well, it doesn't clearly show that that is the petitioner. But he's the one who submitted that document, doing the best he can to corroborate his claim with some identification documents. I'm going to tell you right now that was, one moment. That was part of Exhibit 5, starting with page 452. Okay. Now, again, this isn't the clearest picture in the world, but you could still make out his face, and I believe that the image there, if you look at the record on the signing page of his application, page 468, maybe one could find some similarity. But even if you couldn't, again, the petitioner is just trying to buttress his claim. And for the judge to, again, leap to speculation and conjecture that why would his son get a passport before him, is immaterial. It does not go to the heart of this claim. I'm going to reserve my remaining minute for rebuttal. Thank you. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Robert Foster. I'm with the United States Department of Justice. I'm here on behalf of the Respondent, Alberto Gonzalez. I think that all of these cases are difficult. I think the Court has recently received some new citations from opposing counsel. I don't know if the Court's had a chance to read those cases. At least one or two of them, I think, inform my response to the Petitioner's Counsel's statement. And I think what the Court. There's a couple of points I think I ought to make. First of all, this Court historically has accorded deference to demeanor findings, especially when the demeanor findings are stated with specificity in the transcript. As you have noted, Judge Berzon, that specificity is in the transcript and is, in fact, cited for a paragraph or so in the brief that was filed by Respondents last year. But I think it's quite disturbing to us to think that we can judge by the fact the individual recites his case in just kind of a monotone, that that is the reason to think that it's not accurate or true. You know, different cultures and different people do things in different ways. We know that in some cultures they look down. In our culture, we think that if you don't look people in the eye, that they're lying. So I find it very, very difficult to rely on any kind of demeanor testimony. And I appreciate Your Honor's point. I guess that's why these cases are so difficult. Virtually all of the cases that I've read from this circuit involving these types of credibility determinations involve people who are from different cultures, and there frequently are translation problems that are involved. Different people do have cultural. But this is not just a cultural problem. This is also a personality problem. I understand that. You know, if some people are in a formal setting and they're supposed to be telling their story, they will tell it in a dispassionate way because they think that's what they're supposed to be doing. Well, and that's sort of the point that I want to make. But it doesn't necessarily follow that because all of these cases present people with cultural differences, it doesn't necessarily follow that demeanor findings are necessarily a question, as some of the cases have been before this Court, where the Court has perceived that there was a cultural insensitivity on the part of the judge. Jabril, I think, says to us that whereas in certain circumstances there can be cultural insensitivity or bias or other factors that this Court should take into account, those aren't present here, and the I.J. is not expected entirely to park his common sense or her common sense at the door when going in to ascribe, it seems to me, demeanor issues and implausibility issues in every circumstance to the potential for bias and the potential for ‑‑ At least some of the things the I.J. said were really quite silly. I mean, like the thing about the affidavits being in English because they come in case after case like that. I mean, India is not a place where people don't know English. Absolutely right. Even if these particular people didn't know English, the fact that they would talk to somebody who would then translate it and write it down in that way is not unusual. It happens all the time. I agree, Your Honor. And his business that he had at the beginning with the guy's name was clearly wrong. Right. And the respondent, I think, brief was candid in the Court about that. One thing that's always disturbed me is our case law says that as long as one of the I.J.'s reasons holds up, we're supposed to approve it. But that doesn't seem right in the sense that that's not the way people make credibility determinations. They make them in the aggregate. In other words, somebody says, I don't believe this person. Why don't you believe him because of A, B, and C? And if one of those wasn't there, maybe I would believe him. So in this instance, we've now negated, you know, two main things that the I.J. relied on and we're pretty much down to the demeanor testimony. Can we affirm it just on the demeanor testimony? Or can we deny it? I think the medical question was of importance to the question of the failure to seek medical attention was of importance to the I.J. And I don't understand this Court has eliminated that from the list. I think the primary reason. Well, but I thought she had a pretty good answer. It wasn't that he'd have a claim to have had broken bones or anything like that. Some people accept pain a lot better than others. If you're a poor person in the community and you don't really need the medical attention, I could see why you wouldn't go. The record doesn't reflect, I don't think, one way or the other, whether poverty or whether he had the ability to obtain medical assistance or did not. I think the record is silent on that, what I would like to focus the Court on. Well, it's not silent that he lived in a small community. It wasn't like he was living in New Delhi or Bombay. I understand that, Your Honor. But the record is silent as to whether similarly situated people in that community do or do not seek medical attention after what the record shows may have been a fairly severe treatment at the hands of the police. What I think I'd like the Court to focus on is the fact that there's a whole series of things that were articulated with specificity, and we can go through each one of them and ascribe cultural differences to his demeanor or to his failure to seek medical care. Let me ask you this, counsel. I've looked at his I-589 and his testimony, and they seem completely consistent. Now, often when I'm looking at these cases, I'll see some inconsistencies there which raise questions, and I'm then more able to say, yes, I think the I.J. had a basis for not finding this individual credible. That's not true in this case. I agree. I agree there aren't specific record inconsistencies that the I.J. pointed to. His determination was based, as I think Jabril would permit him to do, to use his common sense. And let me just say this, if I might. I think it was kind of uncommon sense as we look at his different reasons. Well, I respectfully disagree, Your Honor. When I looked at the cases, I tried with, frankly, some lack of success to try to determine a bright line between those situations in which the I.J. has permitted to use what I've characterized as his common sense and those cases where the determination of the I.J. on credibility matters was considered to be speculative. And to the extent that I was able to draw a line at all, it seems to me that where the I.J. is looking at the person and listening to what the person says, and it appears from the I.J.'s opinion that what the person says is inconsistent with his understanding of human nature, that's common sense and the court ought to uphold it. Contrary example is a case like Gee, where I understand that there the court determined, for example, that what the I.J. was doing was specifically speculating, to use counsel's term, about what the Chinese police might do and projecting his own view onto the behavior and the motivations and the thoughts of people not in his courtroom. But what about the fact that we have – let's say there were five reasons given here. One was the medical. Another was the passport. Another was the demeanor. And then we have the affidavit and the name. He gave a lot of stress to the name. He gave a lot of stress to the affidavit. Why do we think he would have made the same credibility determination if we said, well, forget those two things. They don't make any sense in terms of common sense. The way people do commonsensically make a credibility determination is in the aggregate. I agree. And I think this person did – the I.J. did a good job of articulating, I guess, my response to your question, Your Honor. Because he thought – he had – and I thought that counsel today did an interesting job of demonstrating why he just misunderstood those affidavits. He didn't know what was going on there. I think that a reading, a fair reading of the I.J.'s opinion shows that the affidavits had relatively small weight. Of the most weight, probably, is the demeanor evidence, something which one can explain. But I don't think it's consistent with this Court's opinion. I believe it's in Sinkower. I may not be saying that correctly. Not to give the I.J.'s determination of credibility extra weight or more weight when the I.J. and not any of us was actually sitting there looking at this person. He made an adverse credibility determination in large part on demeanor. I think this Court tells us that that's to be given weight. He articulated, based on the record and what he saw, his reasons for the adverse credibility determination with respect to demeanor. And, therefore, given our – your standard of review, I think – I think – And another reason he gave was this thing about the dates. And that almost seems to cut in the other direction. I mean, he has no motive for being confused about his birthday and his – I mean, about his marriage date or whatever. He obviously wasn't a very articulate fellow overall. You know, why does he have these particular dates right? Because he presumably went over and over with his lawyer because he better get them right. These other things didn't matter very much. That's an interpretation, I think, that would call for speculation on the part of me or Petitioner's counsel. I think an equally adequate explanation, and I think it's what the I.J. believed, is that the testimony of the Petitioner was coached and rehearsed in part. And so he was better prepared to speak to his torturer. Well, people coach and rehearse their witnesses. They don't let them go on the stand without giving – without going over their story. That doesn't mean it isn't so. I understand that. My time is up. If he didn't coach him. Okay. Thank you very much, counsel. Thank you, Your Honor. Your Honors, I just wanted to say the last word about the demeanor issue, which I think is the main issue, after everything is said and done. This case, I think, shows that the I.J. tried to use common sense, but I think was perhaps diverted with his own feelings and emotions. There was this element of maybe some human nature, some negative feelings towards the respondent that washed over the I.J.'s opinion. In the case I cited, Smolniakova, on the additional citations, there was an alleged fraudulent marriage and an asylum application, and the court admonished that the I.J. shouldn't sort of wash over a negative finding in one matter to other matters. And I think that the I.J. looked at some of these smaller issues, had a negative feeling, and then decided to put all his eggs in a basket and make it call it a negative demeanor finding, thinking that that would be sufficient to deny the case. But he, unlike Jibril, did not note that the petitioner looked away or looked embarrassed or turned red or flushed. He did any of the things that the court noted in Jibril. Simply speaking, and as the court noted, a monotone voice is not a reason to deny the case, especially when everything that the petitioner said was consistent with the application. Thank you. Thank you very much, counsel. The case of Singh v. Gonzales is submitted, and we will recess for the next recess. Thank you.
judges: B. Fletcher, Berzon, Trager